Kahn *v.* Hardy.

4-6080 144 S. W. 2d 725

Opinion delivered November 4, 1940.

*Walter L. Pope, H. M. Trieber, Moore, Burrow & Chowning, Henderson, Meek & Hall* and *S. L. White,* for appellants.

*Coleman & Riddick,* for appellees.

McHANEY, J. The appellants, other than Sidney L. Kahn, are the Mercantile Trust Company and G. S. Jernigan, Bank Commissioner in charge of Union Trust Company. The appellees and cross-appellants, other than Corinne Hardy, are George L. Mallory, C. M. and Elizabeth Taylor, Hamilton Moses and the estate of C. M. Conway by Hamilton Moses, administrator.

The record now before us is the consolidated record of three separate cases, growing out of the affairs of the Research Development Company, a domestic corporation organized on December 8, 1927, which became the owner of a large tract of land just west of the city of Little Rock. One of said cases was an action to foreclose a deed of trust given by the Research Company on said lands to the Union Trust Company, as agent, to secure a note or bond issue of $75,000, wherein the Union Trust Company had sold and assigned some of the notes or bonds to various purchasers. In this case there was first a decree awarding parity of security under the deed of trust to all noteholders, and thereafter, after the lapse of the term, there was another decree postponing the lien of the Mercantile and Union Trust companies to that of other noteholders. Another case grew out of a written instrument executed by certain of the appellees and others guaranteeing the payment of the note or bond issue of $75,000 of the Research Company to the extent of $5,000 each, in which there was a decree awarding to certain of them liens upon the lands ahead of the lien of

the indebtedness which they had guaranteed. The third case was a suit by certain stockholders of the Research Company against Sidney L. Kahn, who originally owned all the issued stock, to rescind their purchases of $10,000 stock each, and they also sought certain recoveries against Kahn in behalf of the Research Company.

The original complaint in the third case, which we will refer to as the Kahn case, was filed May 7, 1936, and was a suit by Mrs. Hardy against Kahn and Research Development Company as a stockholder of the latter for the use and benefit of herself, other stockholders and the corporation. It alleged various fraudulent acts of Kahn in the acquisition of a large tract of land, nearly 8,800 acres, west of Little Rock, the transfer thereof to a corporation organized by him with "dummy" stockholders, the issuance of 2,030 shares of stock therein to said nominal stockholders, the assignment of said shares to him in blank, the sale of a part thereof as treasury stock and the distribution of the funds thus realized to him. Several forms of relief were prayed and a receiver for the corporation was asked. Kahn filed motions to strike various allegations of the complaint and for misjoinder of causes of action, which were overruled and he answered with a general denial, a plea of voluntary payment to him by the corporation and a plea of the three and five year statutes of limitations. A master was appointed on December 11, 1936, who was directed to take the testimony in the cause, to make findings of fact and of law, and to make recommendations for a decree. A receiver for Research Development Company was also appointed, the master and receiver being the same person.

On November 9, 1938, the complaint was amended by making Oscar W. McCaskill a party defendant, and by making the executors and trustees of the estate of M. W. Hardy, C. H. Moses, personally and as administrator of the estate of C. M. Conway, and George L. Mallory, parties plaintiff. On February 25, 1939, Mrs. Julia P. Taylor and United Corporation, as trustees of the estate of C. M. Taylor, deceased, and Charles M. Taylor and Elizabeth Taylor intervened in the Kahn case

and adopted the complaint and the amendment to complaint of Mrs. Hardy and others. We do not set out the allegations of these pleadings, all of which were denied in timely answers, but all that are material and on which reliance is placed will appear hereinafter.

Thereafter the master took the testimony, from which he made findings of fact and of law that exonerated Kahn of any fraudulent conduct in the acquisition and transfer of said lands to the corporation, or in the organization of said corporation, or in the sale of stock to any of the appellees and recommended a decree to this effect. He did find, however, that in the distribution of the proceeds of the $75,000 loan, he was paid certain sums to which he was not legally entitled and recommended that he be charged therewith. On a hearing before the court on exceptions filed by both sides to the master's report, a decree was entered setting it aside in all respects, and the sales of stock to appellees were rescinded and they were directed to surrender their respective certificates of shares to Kahn, properly indorsed, and entered judgments in favor of appellees against Kahn for $10,000 each, with interest at 6 per cent. per annum from November 9, 1938, except as to appellees Chas. M. and Elizabeth Taylor, whose judgment should bear interest at 6 per cent. from February 24, 1939. In all other respects the complaints and amended complaints and interventions were dismissed for want of equity. This decree was made and entered November 28, 1939. It was slightly modified as to the judgment in favor of the Taylors by a supplemental decree of December 26, 1939, which latter decree will be considered elsewhere in this opinion.

From the decree of November 28, 1939, in the Kahn case, he has appealed and appellees therein have cross-appealed.

It is first insisted by counsel for Kahn that appellees were not induced by fraud or mispresentation to purchase their stock in Research Development Company, and that the evidence of fraud and mispresentation, if any, as to the late C. M. Conway's purchase of stock

was incompetent. It is next argued that appellees' cause of action, if any, is barred by limitations and laches.

In the consideration of the question first presented, it becomes necessary to state the history, now almost ancient, of transactions out of which this litigation arises. The following findings of fact by the master are undisputed in the evidence: "Early in 1927 and probably prior thereto, there was a plan or program being promoted by the Methodist Episcopal Church, South, to consolidate its various schools in Arkansas and form one large university and locate same in the vicinity of Little Rock. Oscar McCaskill and Sidney L. Kahn conceived the plan of assembling a large block of land near Little Rock with the view of giving or ceding several thousand acres of same to any school or university that would accept same and build and maintain an institution, reserving to themselves sufficient acreage, the enhanced value of which caused by establishment of the school or university would procure a profit for them out of the acreage retained. Both Kahn and McCaskill were dealers in real estate, and Kahn agreed to furnish the money for the purchase of the land, McCaskill to superintend the purchase and development of the land; after Kahn had been reimbursed for all sums expended by him, he and McCaskill were to share equally in the net profits. A written contract was entered into between Kahn and McCaskill embodying their agreement. Later McCaskill entered into an oral contract with E. J. Bodman, on a fifty-fifty basis, to share his profits in the contract he had with Kahn.

"It was decided between McCaskill and Kahn that in the purchase of lands it would be better that Mr. Kahn did not show up in the transactions; that it would facilitate the purchase of the land for him to keep in the background as a purchaser, and it was decided to purchase the lands in the name of John Sherrill, trustee.

"Beginning in the spring of 1927, Kahn and McCaskill began to purchase and assemble the lands, and by December of that year they had purchased several contiguous tracts west of Little Rock comprising 8,710 acres.

Mr. Kahn paid in cash for said lands the sum of $109,-733.98 and assumed liens on the lands in the sum of $20,574.23, making the total cost of the lands $130,308.21.

"In December of 1927, Mr. Kahn, who was the real owner of the aforesaid 8,710 acres of land although the deed was in the name of John Sherrill, trustee, decided to organize a corporation and have the lands deeded to the corporation. He persuaded John Sherrill, somewhat against his will, to act as president of the corporation and also as attorney in its organization. Mr. Kahn, under the evidence in the case, dictated the terms of the corporation and also let it be known that he desired not to be known as one of the incorporators. The evidence gives no reason why he preferred to stay in the background in so far as the proposed corporation was concerned. Mr. Sherrill suggested that his brother-in-law, H. H. Naff, would be interested in the corporation and would take 100 shares of stock. Mr. Naff was not present, but Mr. Sherrill took the authority to use his name, and the corporation was organized and called the Research Development Company with an authorized capitalization of $250,000, consisting of 2,500 shares having a par value of $100 per share. Mr. Sherrill was named president of the corporation; Mr. McCaskill, secretary, and Mr. Naff, director.

"Mr. Sherrill as trustee deeded the 8,710 acres of land to the Research Development Company in exchange for 2,030 shares of stock, the corporation assuming the liens on the land in the amount of $20,574.23. Thus we find that the corporation paid in stock, par value, $203,-000 for the land that had cost in cash $109,733.98. 1,830 shares of this stock were issued in the name of John Sherrill, 100 shares in the name of Oscar McCaskill, 100 shares in the name of H. H. Naff. This stock, all of it, shortly thereafter was indorsed in blank by Sherrill, McCaskill and Naff, and turned over or delivered to Sidney L. Kahn."

As stated by the master, the Research Development Company was incorporated in December, 1927. Stock was issued to Sherrill, McCaskill and Naff in a total of

2,030 shares, all of which was indorsed in blank and turned over to Kahn who deposited it with the collection department of the Union Trust Company, and thereafter, from September, 1928, to December, 1929, seven sales of stock of 100 shares each were made, five of such sales being to the appellees and were negotiated by Oscar Mc-Caskill or E. J. Bodman, or both, except the sale to appellee Mallory who purchased because of Mr. Sherrill.

M. W. Hardy agreed to purchase $10,000 of stock on May 30, 1928, and on or about that date he signed a note to the Union Trust Company jointly with Kahn, Bodman and McCaskill for $25,000, to be used in paying for said lands. It was understood his liability should be limited to $10,000 of the principal and interest thereon, and when paid would be payment for his stock. Mr. Hardy died in November, 1929, and his executors and trustees paid the $10,000 and interest on January 4, 1930, to McCaskill, as treasurer of the Research Company, who turned it over to Kahn and he surrendered 100 shares of stock and same were reissued as directed by the executors. It is perfectly apparent from this record that Mr. Hardy knew all about the purpose for which the land was acquired, how it was acquired, the price paid for it and the price at which it was conveyed to the corporation for which 2,030 shares were issued as above stated. It is undisputed that Mr. Hardy was a moving influence in an effort to have the Methodist denomination establish at Little Rock a great university into which should be consolidated all its schools and colleges and that he had frequent conferences with the church dignitaries to this end. He was an outstanding business executive and a man of wide influence in community affairs. He undertook to interest business associates and friends at El Dorado in this venture. Not only did he know all these matters, but he signed with Kahn, McCaskill and Bodman the $25,000 note above mentioned for the very purpose of raising funds to pay for these lands, with full knowledge that Kahn had advanced all the money to pay therefor, approximately $110,000 in cash and had assumed outstanding liens of about $20,000, and that $10,000 of said amount represented his purchase of stock.

As to Mr. Moses and Mr. Conway, the record discloses that they knew most, if not all, of the facts and circumstances connected with this venture as well as Mr. Hardy did. Their principal complaint is that it was represented to them by McCaskill and Bodman that they were buying treasury stock and not the stock of Kahn, and Mr. Moses is quite positive that had he known he was buying stock from Kahn, he would not have bought. He testified, however, that he understood that, if the sale of stock didn't fully pay for the land, Mr. Kahn and Mr. Hardy were to take stock in the corporation for the difference between the amount of money subscribed in the sale of stock and the actual cost of the land to the corporation. In other words, that the proceeds of stock sales would first go to pay the purchase price of the lands, and if insufficient, Kahn and Hardy would take stock for the difference. This being true, what possible difference could it make to Mr. Moses and Mr. Conway whether they acquired treasury stock or stock that had been issued to Kahn? In either event the money was to go to Kahn, and, if treasury stock had been issued to them Kahn would have legally been entitled to surrender for cancellation an equal number of his shares and to receive the cash therefor, which is the equivalent of what was actually done. This, therefore, cannot be the basis for an action of fraud. While Mr. Moses thinks now, some twelve years later, and honestly so, had he known he was buying Kahn's stock, he would not have done so, this is a retrospective view of the matter, and, since the difference in the procedure was without substance, the representations made are not sufficient to constitute fraud justifying a rescission.

As to Mr. Mallory, it is undisputed that he bought his stock because of Mr. Sherrill's connection with the matter and not through the representations of either McCaskill or Bodman. His claim that he bought what he thought was treasury stock, and that he would not have bought Kahn's stock had he known it, must be denied for the same reason the Moses and Conway claims are denied.

As to Chas. M. and Elizabeth Taylor, their stock was purchased by the Union Trust Company as the active trustee of the C. M. Taylor estate, which trusteeship has since been settled and the estate turned over to the beneficiaries, including this stock. Mr. C. M. Taylor was and had been for some two years or more an employee of the Union Trust Company in its real estate department, under McCaskill who was vice-president and manager of the real estate department. He approved the purchase by "OK"ing the charge ticket against the trust account in payment of the stock, which approval was not necessary, and his being asked to do so was unusual. While he said he thought treasury stock was being purchased, the Union Trust Company, acting through its trust officer, must have known it was Kahn's stock, for it was on deposit in the collection department. His own testimony and that of McCaskill show that he had general knowledge of the purpose of the corporation, the acreage acquired and paid for by some one and the price at which it had been turned in to the corporation. Mr. Taylor was later elected and served as a director of the corporation. We think what has already been said about the purchase of treasury stock applies here, and that the proof is insufficient to justify a rescission.

It is strenuously, if not vehemently, argued by learned counsel for appellees that the whole scheme was one conceived by Kahn in sin and promoted in iniquity as evidenced by the undisputed facts that he bought the land through McCaskill's agency, took the title thereto in the name of Sherrill, trustee, had the corporation organized with Sherrill, McCaskill and Naff named as stockholders, caused 2,030 shares of stock to be issued to them, which they assigned in blank and delivered to him in payment of the purchase price of said lands, and thereby wholly concealed his connection with the matter. It is said the corporation was only a mask to conceal Kahn's connection with the whole scheme which was one to defraud appellees and the other stockholder victims; that he sensed, long before anyone else, that the effort to secure the establishment of a great Methodist university here would not succeed and that he at once under-

took to saddle his losses on these unsuspecting victims through his ''corporate mask.'' We think these charges are without substantial foundation. It is explained to our satisfaction that the purchase of the lands in the name of Sherrill instead of Kahn was done for the purpose of enabling them to acquire a large number of small tracts at a reasonable price. Kahn feared that the use of his name might cause, in purchasing tracts, prospective vendors to raise the price. Just why Kahn's name was not used in organizing the corporation is not explained in the evidence. Just why Hardy's name was not used is also unexplained. Whatever the reason was, each and all the appellees and other stockholders knew that Kahn and Hardy were the promoters of the undertaking at the time they bought stock, and at all times thereafter, and the fact that his name was not used as an incorporator could not and did not deceive them.

Moreover, in December, 1930, all the appellees, except Mr. Hardy who had died, were called upon to execute a written guarantee to the Union Trust Company for $5,000 each, as security additional to a deed of trust on said lands, to secure a note or bond issue of $75,000, and all except Mallory did execute and deliver said guaranty. At that time the dream of a great university had vanished and the corporation and its investors were left with all this unimproved land, on which subsisting liens had to be paid as well as taxes, both past and presently due. It would seem certain that men of affairs and good business judgment, such as appellees, had they been defrauded in the purchase of stock, would have made some investigation into the affairs of the corporation, before sending each another $5,000 on the selfsame course. By the exercise of reasonable diligence at that time appellees could have discovered all that they have now discovered, and if so, under well settled rules of law, they must be held to have known all that such an inquiry would have developed. 17 R. C. L., § 105, p: 741; 37 C. J., § 309, p. 939. This being true, whatever action for fraud in the sale of stock they might have had, if it be so conceded, would be barred by the five-year

statute of limitations, § 8938, Pope's Digest, which was specially pleaded in bar of the action.

On December 19, 1938, a day of the October, 1938, term of court, a decree in the foreclosure case, hereinbefore mentioned, was entered, wherein Mercantile Trust Company and Grover S. Jernigan, Bank Commissioner in charge of Union Trust Company, and all other noteholders were plaintiffs, and Research Development Company was defendant, awarding judgment to each of ten noteholders for the amount of their notes and interest and giving to each a lien on the lands covered by the deed of trust, "by virtue of the deeds of trust and obligations sued on herein, to secure ratably the payment of the said sums and accruing interest aforesaid, and their costs herein, which is prior and paramount to any right," etc., of the defendants. This decree reserved the right later to determine when the lands should be sold and to determine the issues raised by an amendment to the complaint by the Taylors and an intervention by Kahn, issues not here pertinent, and concluded with this language: "and all other issues between the parties in said consolidated cause not herein now adjudicated. . . ." This foreclosure action had been, on the same date, consolidated with the case of *Hardy, et al., v. Kahn, et al.* This decree of December 19, 1938, became final, no appeal having been taken therefrom, but on December 26, 1939, more than one year later, the court undertook to and did set aside its decree of December 19, 1938, and entered a supplemental decree which disturbed the parity rights of the noteholders given by the former decree. In this we think the learned trial court erred, for after the lapse of the term, the court lost control of its judgment, except under the provisions of § 8246 of Pope's Digest the provisions of which were not invoked. *Evans* v. *Anthracite Coal Co.*, 180 Ark. 578, 21 S. W. 2d 952; *Fawcett* v. *Rhyne*, 187 Ark. 940, 63 S. W. 2d 349; *Coulter* v. *Martin, ante* p. 21, 139 S. W. 2nd 688. The language of the 1938 foreclosure decree retained jurisdiction of the specific matters mentioned and other matters not adjudicated, but the parity of the rights of noteholders was finally determined, and could not be re-

opened after the lapse of the term under the language of the reservation.

The suit on the guaranty contract was originally brought in the circuit court and on motion was transferred to the chancery court, where it was consolidated with the other two cases. Some of the guarantors paid the amount of their guaranty with interest and they sought judgments against Kahn and the Research Company which the court awarded. Mr. Moses claimed additional fraud in that it was represented to him that all the stockholders would sign the guaranty, and that Mallory did not sign. The holding already made that there was no fraud in the sale of stock disposes of the argument as to the guaranty and the judgment against Kahn on this account was, therefore, erroneous. The separate contention of Mr. Moses cannot prevail against the holders of said notes.

The decree will, therefore, be reversed and dismissed as to Kahn, and reversed and remanded as to the Mercantile Trust Company, and Jernigan, Bank Commissioner, with directions to reinstate the decree of December 19, 1938, as to them, and will be affirmed on the cross-appeal of appellees.

HUMPHREYS and MEHAFFY, JJ., dissent.